JOHN A. STEER & Co. *v.* UNITED STATES (No. 3975)[1]

---

[1] T. D. 48737.

United States Court of Customs and Patent Appeals, December 21, 1936

*B. A. Levett* for appellant.

*Joseph R. Jackson*, Assistant Attorney General (*Charles D. Lawrence*, Special Assistant to the Attorney General, and *John F. Kavanagh*, special attorney, of counsel), for the United States.

[Oral argument December 7, 1936, by Mr. Levett and Mr. Lawrence]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

The appellant imported several shipments of goods which, as described in the report of the collector, comprised "when assembled, a complete anhydrous ammonia plant." This the collector classified as an entirety, under paragraph 353 of the Tariff Act of 1930.

The importer protested, claiming the goods to be dutiable under paragraph 372 of said tariff act. The material portions of said paragraphs are as follows:

PAR. 353. All articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy;

electrical telegraph (including printing and typewriting), telephone, signaling, radio, welding, ignition, wiring, therapeutic, and X-ray apparatus, instruments (other than laboratory), and devices; and

articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs;

all the foregoing, and parts thereof, finished or unfinished, wholly or in chief value of metal, and not specially provided for, 35 per centum ad valorem.

PAR. 372. * * * all other machines, finished or unfinished, not specially provided for, 27½ per centum ad valorem: * * *.

The United States Customs Court overruled the protest, and from that judgment the importer has appealed.

There is no illustration of the apparatus in the record. We learn, however, from the testimony introduced in evidence, that the imported articles have been constructed into a liquid anhydrous ammonia plant, located at Wyandotte, Mich. The plant, as indicated by the record, is very large and extensive, and includes much machinery of various kinds. The purpose of the apparatus is to make liquid anhydrous ammonia from two gases, hydrogen and nitrogen. This is done by a process of synthesis in the presence of a catalyst. The gases are mixed in the proper proportion, then compressed to a pressure of 100 atmospheres or above, then purified of their oxygen content by passage over palladium-asbestos, and are then passed into and through heat-exchangers where their temperature is raised. After the temperature is raised to a certain degree, synthesis begins, during which certain of the gases are converted into gaseous ammonia. Three gases come out of the synthesis vessel, namely, nitrogen, hydrogen, and ammonia. The gases then go through the other side of the heat-exchanger, and are partly cooled, after which they go through other heat-exchangers and are further cooled to liquify the gaseous ammonia. This anhydrous ammonia is then taken out and the remainder of the gases passes through the system again. The operation is continuous, the incoming gases continuously equalling the output caused by the removal of the liquid ammonia.

When the plant entered the customs, it had no motive power with it. As set up and operated, its motive power is an electric motor, made in the United States and supplied here. This motor is used to drive the compressor by which the super-atmospheric pressure is obtained. The record shows that, as the apparatus is imported, it could be operated with any kind of power which was available, either electric, steam, or water power. The motor which was installed, and from

which the compressor is driven, is located in the cellar of the plant, and drives the compressor by means of a belt from the motor shaft.

Aside from the motor which is used as above stated to drive the compressor, there are two other electrical elements, namely, two heaters. These are used in the operation of the plant as follows: In each heater there is a ribbon of Ni-chrome. This ribbon is suspended with suitable insulators in a forging in the shape of a hollowed-out vessel. When it is desired to start the apparatus, an electric current passes through these ribbons of Ni-chrome and heats the same so that the gas, in going into the synthesis vessel, passes the heaters and becomes warm enough for the ammonia reaction to start. As soon as the reaction starts, it is self-perpetuating, enough heat being derived from the process of synthesis to keep the operation going. As soon as the reaction starts, these electrical heaters are turned off and are no longer used except when it is again necessary to start the process.

The record of the plant shows that these heaters have been used only from two to three per centum of the total operating hours of the plant.

The heaters have a value of about $1,500, while the whole plant is valued at over $100,000. The trial court states in its decision that this evidence was excluded, but it does not so appear in the record.

The manager of the Pennsylvania Salt Manufacturing Co., the operator of the plant, was called and examined. He testified, in part, as follows:

Q. Now will you state whether that heat, the initial heat, which is necessary, or the heat which may be necessary, if the apparatus would stop, could be supplied practically and economically by other methods than by the electrical ribbon of which you spoke?—A. It could be supplied by means of a tube bundle heated by condensing mercury vapor. Instead of mercury you could use diphenylene oxide and diphenyl compounds. Those methods of heating to temperatures higher than steam have come into common use in the last five or ten years.

Q. Well, applying it to the particular plant in question; you have spoken of these chambers made of forgings; could you use those with the mercury or with the other?—A. I believe it would be entirely feasible to remove the electrical heating elements and put in their stead a properly made heat-exchange bundle that should be of the return tubular type in which you could condense, say, mercury; and at a pressure of, say, 50 pounds gauge, you'd get about 450° Centigrade, which is some 50 or 75° Centigrade above what you require to start off the synthesis vessel.

Q. Just how would you go about this if you wanted to transform that from an electrical to a mercury vapor heating system?—A. I'd remove the electrical parts and install a heat-exchange bundle I referred to.

Q. Would that be a very complicated proposition?—A. No.

Q. Can you give us any idea as to the relative cost of operation of the electrical unit as compared to the mercury vapor unit, for instance?—A. Well it is generally conceded that heating by electricity is about the most expensive form in which heat can be supplied. In the case of this installation we were willing to sacrifice a little on the cost for the convenience, because it is simply so easy to turn a switch and have the heat. If we had been contemplating an installation where we would have to heat for much longer periods, we would have undoubtedly gone into other methods.

In addition to the heating units, the report of the collector indicates that there is an electric refrigerator unit. As to this refrigerator, the witness Penfield, heretofore quoted, said:

Q. Mr. Penfield, in the appraiser's report which has been received in evidence, it states that the merchandise consists of several shipments made up of compressors, heaters, tanks, condensers, and refrigerators, the latter being operated electrically. Will you state just what that refrigerator is and how it is operated?— A. The refrigerating machine is a compressor of the piston type, the pistons moving horizontally, driven by means of a belt from an electric motor. Its purpose is to supply the refrigeration necessary to condense the ammonia gas coming from the synthesis vessel, and reduce it to liquid ammonia.

Q. Has it any electrical units, that refrigerator?—A. No.

Q. And how is it run?—A. How is it driven? By means of a belt-drive to a G. E. motor.

The trial court came to the conclusion that the imported apparatus was within the purview of said paragraph 353 as "articles having as an essential feature an electrical element or device, such as electric * * * heaters", because of the presence of the two heating units, and not because of any other electrical feature in the assembly. The court did not hold that the proof showed the presence of electrical refrigerators. This refrigerating unit, according to the witness Penfield, had no electrical units, although it is somewhat uncertain as to just what the witness meant by this expression. It does appear that the device consisted of a compressor with horizontal pistons, which was driven by a belt from a motor shaft. No motor was imported with the shipment. Therefore, so far as the record shows, the refrigerating unit was in the same condition as the main compressor unit, both of which were operated by belts from a motor shaft, which shaft might have been propelled by any sort of power desired to be used.

We are unable, therefore, to discern wherein the refrigerator might be said to be, when imported, an electrical refrigerator.

The trial court was of the opinion that the apparatus involved herein constituted a machine. The court was further of opinion that, although the use of a motor in operating the compressor did not bring the apparatus within the purview of paragraph 353, the electrical heaters which were used for the initiation of the synthesis process were sufficient to bring the apparatus within said paragraph 353, as articles having as an essential feature an electrical element or device.

Said paragraph 353 first appeared in the Tariff Act of 1930. This paragraph has come under our observation on various occasions. The first attention we gave to it was in *United States* v. *R. W. Cramer & Co., Inc.*, 22 C. C. P. A. (Customs) 45, T. D. 47049. We again discussed it in *United States* v. *Dryden Rubber Co.*, 22 C. C. P. A. (Customs) 51, T. D. 47050, and, finally, in *Ralph C. Coxhead Corp.* v. *United States*, 22 C. C. P. A. (Customs) 96, T. D. 47080.

In *United States* v. *Dryden Rubber Co., supra,* a rubber cutting machine was imported. The machine was one which was about 6 feet wide and 10 feet long, and was so constructed that a horizontal band saw would remove successive slices of rubber from a rubber cake which was moved back and forth past the saw, the cake being elevated after each slice was removed. When imported, the machine had an electric motor with it, and a proper place upon the frame for its mounting. This motor operated the saw and caused the device to function. In addition, there was a small motor mounted upon the side of the machine which furnished the motive power for two small emery wheels which were in constant contact with the blade to keep it sharp so that it would function.

We discussed the said paragraph 353 and made the following observations:

An examination of the language of the third division of this paragraph disclose[8] that the articles therein *eo nomine* specified are of various types; they have, however, one characteristic in common, an essential electrical feature. A fan, a washing machine, and a sign seem to have little resemblance, but their analogy rests in the fact that electricity is the essential feature which causes them to function and perform their work. The language evidently was intended to be read, "articles * * * such as electric motors, fans", etc., thus giving these named articles as examples of such as are intended to be covered by the paragraph.

Many of the articles named in said language are such as might well function with the aid of other than electrical power, if it were not for the fact that, by being named therein, they must be considered as electrical in their nature; that is, a fan, to be included within the language, must be an electrical fan, a heater must be an electrical heater, a washing machine must be an electrical washing machine, a portable tool must be an electrical portable tool, and so on.

There are two inquiries, therefore, when the question of the classifiability of an article under this division of the paragraph is under consideration: First, is it essentially an electrical article? The electrical feature must be an essential feature, without which the article will not function, normally, for the purposes intended, for, it must be manifest, that if it be not an electrical article, it does not come within the division at all. Second, if it is such an electrical article, is it an article named in the language, or within the class of articles named in this paragraph?

From what has been said, it follows that if the article, when it is imported, is designed and constructed to use electrical power or other power, interchangeably, then it has not, as an essential feature, an electrical element or device.

On the other hand, if, when the article is imported, it is so constructed as to utilize electrical power solely, and, therefore, is, essentially, an electrical article, and its various parts are imported, are intended to be used, and are used, together, as was the case with the imported merchandise, then no reason can be seen why it should not be considered, for dutiable purposes, within the scope of the third division of this paragraph, for in such case, we think the article should be held to be included within the class of articles named in the paragraph.

In that case we held that the machine was essentially an electrical machine, designed and used as such. As to the question whether it

was *ejusdem generis* with the other devices named in the paragraph as examples, we said:

We are then brought to the inquiry whether the imported machine for cutting rubber was a machine such as was intended to be included within this subparagraph. The machine is a horizontal band saw of moderate size and is such a device as could be easily moved from place to place. In view of the very evident intent of the Congress to gather, generally, various types of electrical devices into this paragraph, it is believed that this machine, if essentially an electrical machine, may properly be considered as of the class to which the stated language of the paragraph refers.

As to the small motor which was used to operate the emery wheels, the court did not find it necessary to express its view as to whether it, in itself, was sufficient to constitute this article an electrical machine.

If we measure the dutiable status of the apparatus involved in the case at bar by the rules laid down in the *Dryden Rubber Co.* case, *supra,* we come to these conclusions: The apparatus imported here, except the heating units, when imported, was capable of being used with any kind of power without rebuilding. It was not, therefore, in that respect, an article having as an essential feature an electrical element or device. In fact, no such contention is seriously made here. The only point seemingly relied upon is the electrical heater units.

In the *Dryden Rubber Co.* case, *supra,* we gave it as our view that the rule of *ejusdem generis* should be applied in classifying articles under this paragraph. Obviously the applicability of such a rule is more apparent in said paragraph 353 than in the ordinary application of the rule of *ejusdem generis.* Here the law recites a number of devices which shall be taken as examples of the machines or devices which the Congress sought to be included within the purview of this division of paragraph 353. It states: "\* \* \* *such as* electric motors, fans, locomotives, portable tools", etc. [Italics supplied.] As we have before stated in the *Dryden Rubber Co.* case, *supra,* while these articles thus named differ much from each other, still they are typical of the congressional intent. So, in measuring the applicability of the language of said paragraph 353 to the imported apparatus, we must have in mind whether the imported apparatus is of the type or types named in the statute. Is an anhydrous ammonia plant of the size and character of the one here involved *ejusdem generis* with articles such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs? We are unable to see anything in common between them. The particular devices which are named in the statute as exemplars, are devices which are operated electrically, and which are able to function because of their electrical elements. That is true only in a very small degree in the case of an anhydrous ammonia plant, such as the one here imported. The continuance of its operation does not at all depend upon an electrical element. It has, it is true, an electrical heating

element by which the synthesis of the gases is inaugurated, but so, to the same extent, does a gasoline automobile which has its electrical starting device, or an oil burner for a furnace which has its spark plug to start ignition. Yet we dare say no one would seriously contend that such devices should be classified within paragraph 353, even though there were no specific provisions for automobiles or oil burners within the tariff act. Such devices would still be gasoline automobiles and oil furnaces. In other words, they would not be electric machines, and the articles, to be classified under the third subdivision of said paragraph 353, are, as we said in the *Dryden Rubber Co.* case, *supra*, required to be electric machines; that is, machines where the essential operating power of the device is electricity.

In *Ralph C. Coxhead Corp.* v. *United States, supra*, we summed up our view of the purview of said paragraph 353 in the following language:

In view of the legislative history and the context of paragraph 353, we are of the opinion that any article which has as an essential feature an electrical element or device, constituting the article an electrical article, is dutiable as an entirety under the third provision of paragraph 353, and we find no warrant for the conclusion that Congress intended that the motor in such an article should be made separately dutiable from the remainder of the article.

\*    \*    \*    \*    \*    \*    \*

What we have said above with reference to a motor being an essential element of a machine is directed to the question of determining when its operation by any power other than electrical may remove it from the electrical paragraph. We can also understand how an electrical motor might be so connected with the machine or operated in connection with it that its purpose and use would be so trivial and unimportant to the machine as to render it an *unessential* element in the machine. As we understand the issues here, this principle is not involved in the decision of this case.

There can be no question, under the authorities, but that the apparatus is a machine, within the purview of said paragraph 372. *United States* v. *Van Bourgondien Bros.*, 16 Ct. Cust. Appls. 420, T. D. 43135; *United States* v. *Sheldon & Co.*, 15 Ct. Cust. Appls. 308, T. D. 42484; *United States* v. *G. W. Sheldon & Co.*, 21 C. C. P. A. (Customs) 392, T. D. 46913.

It is contended by counsel for the importer that the authority last above cited, in which valves for the identical machines here imported were involved, is authority for holding that the matters here involved are *stare decisis*. We do not agree with counsel in that respect. The issue here presented was not involved in the *G. W. Sheldon & Co.* case, *supra*.

We conclude that the imported articles should have been classified under paragraph 372, and the judgment of the United States Customs Court is *reversed* and the cause is *remanded* with directions to order reliquidation accordingly.

BLAND, Judge, concurs in the conclusion.